# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00851-COA

**FREDRICK CLIFF KIRKLAND A/K/A**               **APPELLANT**
**FREDRICK CLIFF KIRKLAND JR.**

**v.**

**STATE OF MISSISSIPPI**                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/01/2022 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | WILLIAM CROSBY PARKER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/10/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND McCARTY, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. Fredrick Cliff Kirkland was convicted of nine counts of touching of a child for lustful purposes in violation of Mississippi Code Annotated section 97-5-23(1) (Rev. 2006 & Supp. 2015). Counts I through V related to victim M.B.; Counts VI through VIII related to victim K.M.; and Count IX related to victim S.F.[1] The trial court sentenced Kirkland to serve a total of thirty-five years in the custody of the Mississippi Department of Corrections.

¶2. Kirkland raises two issues on appeal, reordered as follows: (1) the trial court abused

---

[1] Initials are used to protect the victims' identities.

its discretion when it denied Kirkland's motion to sever in which he requested that the trial court hold three separate trials as to the three victims; and (2) the trial court erred by finding no discovery violation when the State did not tell the defense that M.B. had her disclosure date tattooed on her left wrist. For the reasons addressed below, we find that Kirkland's assignments of error fail. We therefore affirm his convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶3. During the August 2020 term, a Harrison County grand jury indicted Kirkland for touching a child for lustful purposes in violation of section 97-5-23(1).[2] The indictment contained nine counts, all brought pursuant to section 97-5-23(1) and each providing that the alleged circumstances arose "as part of the same common scheme or plan." Counts I through V related to alleged victim M.B. for acts occurring on or between August 1, 2013, and July 31, 2018; Counts VI through VIII related to alleged victim K.M. for acts occurring on or between August 1, 2014, and July 31, 2017; and Count IX related to alleged victim S.F. for acts occurring on or between August 1, 2016, and July 31, 2017.

¶4. Kirkland subsequently filed a motion to sever, arguing that the nine counts were

---

[2] Section 97-5-23(1) (Rev. 2020) provides, in relevant part:

Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, or with any object, any child under the age of sixteen (16) years, with or without the child's consent, . . . shall be guilty of a felony . . . .

2

improperly joined and requesting that the trial court issue "an order for severance for separate trials of each of the three . . . alleged victims listed in the indictment." At the pre-trial hearing on Kirkland's motion, his counsel asserted that the alleged offenses did not "constitute parts of a common scheme or plan" as required by Mississippi Rule of Criminal Procedure 14.2 because they occurred at different times. He further asserted that trying Kirkland "with these three alleged victims would present . . . a prejudicial problem due to the fact that the jury would be at best confused as to how they are going to accept the testimony of each alleged victim relative to the alleged victim's counts."

¶5. In response, the State asserted that all allegations concerned similar acts during overlapping time periods: M.B.'s allegations all related to Kirkland putting his hand on her vagina at various times from 2013 to 2018; K.M.'s allegations related to Kirkland putting his hand on her vagina at various times between 2014 and 2017; and the allegations in Count IX regarding S.F. related to Kirkland placing his hand on her thigh between August 2016 and July 2017. Additionally, the State pointed out the evidence would show that all three victims were friends with Kirkland's granddaughter, and they all spent the night with his granddaughter at Kirkland's home. The State asserted that the "common scheme or plan" stemmed from Kirkland's alleged actions in "grooming these girls and getting their cooperation or submission to his acts in his home on a foldout couch . . . [or] sometimes in a traditional bed with[in] that home." In particular, the State anticipated that the victims would each testify that Kirkland bought them food, took them on fun outings, and asked them

to stay the night at his house with his granddaughter. Noting that "[e]ach victim's testimony [must] . . . stand on its own," the State explicitly understood that the trial court would instruct the jurors that they must "consider each count separately and render [their] verdict on each count separately."

¶6. The trial court denied Kirkland's motion to sever, finding that there was "a common scheme or plan" related to allegedly similar behaviors on Kirkland's part with "girls [who] knew [Kirkland's] granddaughter [who] spent the night at his house" and all within the same time period.

¶7. The case was tried over five days in May 2022 in the Second Judicial District of the Harrison County Circuit Court.

### I. The State's Case

#### A. M.B.

¶8. M.B. was the State's first witness. She was born in 2002 and was nineteen at the time of trial. She identified Kirkland as the person who sexually abused her. M.B.'s mother was friends with Kirkland, although M.B. believed her mother was at Kirkland's house only "once or twice." M.B. testified that she "would spend a lot of time there after school, especially between the years of junior high and high school." She said that she "would spend the night. Most weekends I was there. I was there almost every day."

¶9. Kirkland's daughter, her husband, and their two daughters (M.R. and G.R.)[3] lived in

---

[3] M.R. and G.R. were not alleged victims, but we likewise use initials to protect their identities.

4

the downstairs part of Kirkland's home. Kirkland had an apartment upstairs and lived there. M.B. was three years older than Kirkland's granddaughter M.R., but they just "clicked" when M.B. was spending so much time at Kirkland's house. They were practically "best friends."[4]

¶10. During M.B.'s junior high and high school years, Kirkland would pick up M.B. from school and take her to his house. M.B. said that she would nap, play with M.R., or watch TV upstairs. If Kirkland was upstairs while she was watching television, M.B. said that he would come in and "do inappropriate things." She explained that "[h]e would rub my back and my shoulders, and then eventually he'd get into touching my boobs and my vagina" with his hand, sometimes on top of her clothes and sometimes underneath. Kirkland "never" said anything when he was doing this, and "[i]t was never spoken about." They were always alone when this happened except one time someone came in, "and he stopped abruptly."

¶11. M.B. said she liked going to Kirkland's house; there was always a lot of things to do, like getting ice cream, going swimming, or going out to eat. Kirkland would drive the girls around and pay for their activities. Mostly he would take M.B. and M.R. on these outings, but sometimes K.M. went with them. K.M. and M.R. were the same age and went to school together, but M.B. went to a different school. Kirkland also took the girls to Slidell, Louisiana, almost every Saturday and they would go to fun places to eat, get ice cream, and sometimes buy lottery tickets.

¶12. When M.B. stayed at Kirkland's home, she slept on a pull-out couch upstairs. She did

---

[4] M.B. did not know G.R. well. G.R. was M.R.'s older sister.

5

not stay with M.R. because M.R. sleepwalked and talked in her sleep. Kirkland's room was down the hall from the pull-out couch where M.B. slept. M.B. said that one time she woke up in Kirkland's bed, and he was also in the bed, naked. She did not know how she had gotten there. She "believed his hand was resting on [her] leg." She said she "scooted away a little bit, and he scooted closer," so "at one point" she got out of bed. She did not say anything to him or anyone. She said, "It was scary."[5]

¶13.    M.B. said that Kirkland usually touched her on the couch where she slept. She said she "was there almost every day [and] [i]t would happen almost every day." She could not recall the last time it happened and said that it was hard to separate the instances because it "was just all jumbled up together." M.B. said that the first time it happened, she remembers thinking, "[I]s this normal? Does this happen to everyone, or is it just me?" She said that Kirkland would sometimes rub her back when M.R. was there, but he did not touch her on her breasts or vagina unless they were alone. She said that Kirkland moved his hand around on her vagina. She said she felt "icky" and "dirty." Sometimes, after they would go swimming, Kirkland "would ask [her] to remove [her] swimsuit top," and another time, he pulled her pants off while she was lying on the couch on her stomach. He was massaging her

---

[5] In response to questioning during cross-examination, M.B. said that one time she saw Kirkland without clothes on as he was leaving his bathroom after taking a shower. She was upstairs at the time watching television. When he saw her there, he walked back into the bathroom as if nothing happened. Another time, M.B. saw Kirkland in his bedroom masturbating. She was walking by to use the bathroom. She told M.R., who told her parents, and Kirkland later apologized to her.

legs and "said he couldn't get it low enough, so he pulled [her] pants down." M.B. said he did not only massage her legs; he would also "touch [her] butt" with her panties off. M.B. said that she remembers wondering, "Why me?" M.B. said that this went on almost constantly from 2013 to 2016. When she was able to drive herself and no longer relied on Kirkland for a ride, the sexual abuse stopped.

¶14. M.B. said that she was close with K.M., but she was closer to M.R. She met S.F. through M.R., and they "instantly clicked," becoming the "very bestest of friends." M.B., M.R., and K.M. often would hang out together. And once M.B. and S.F. became friends, they spent time together both with the group and separately.

¶15. An extraction from M.B.'s cell phone was admitted into evidence as an exhibit, and M.B. was asked about texts and photographs between M.B. and Kirkland. She said that she and Kirkland texted "a lot" and that he would ask her to stay the night through text messages.

¶16. M.B. acknowledged that she did not tell anyone for many years what was going on because she "was ashamed." But M.B. and K.M. were talking in the bathroom at Kirkland's home while M.R. was also in there, and K.M. somehow brought up the touching in their conversation. M.B. said, "Yeah. It's happening to me, too." According to M.B., "[M.R.] was right there. She heard what we were saying. She was like, 'Oh. Well, that's kind of weird.' That was all she said." That was the end of their discussing the touching, and at that point, they had not told anyone else.

¶17. M.B. eventually told her cheerleading coach Tiffany Andersen about the abuse. M.B.

said that around the time she told Andersen, Kirkland had been texting her a lot, and she was not responding. An extraction from Kirkland's phone was admitted as an exhibit at trial, showing texts and photographs from Kirkland to M.B. He sent her a photo of him with M.B.'s younger sister. That was when M.B. decided to tell Andersen.

¶18. M.B. told Andersen about the abuse on December 10, 2019. M.B. said that day was "burned into [her] memory forever and also [her] wrist." The State asked what she meant, and M.B. revealed a tattoo on her left wrist of that date. At this point, Kirkland's counsel objected to the "demonstrative evidence" of the wrist tattoo. The tattoo and Kirkland's objection will be discussed later in this opinion. M.B. also testified that after she disclosed the abuse to Andersen, she began cutting herself. She said the cutting got "very bad. I have marks all over my body from months and months of cutting." M.B. also tried to overdose on pills.

¶19. M.B. said that after the disclosure, she talked to K.M. on a few occasions but only in short conversations, and M.B. did not know the details of K.M.'s situation. M.B. had talked to S.F. about the abuse before and after she disclosed it, but M.B. also did not know the details of S.F.'s case. M.B. did not tell S.F. or K.M. that she was going to come forward. After M.B. told K.M. and S.F. that she had told Andersen, they seemed "nervous for what was to come." M.B. testified that she decided to come forward because she "had a lot of guilt for letting it go on for as long as it did, and I also was scared that it was going to happen to my little sister, and I don't know what I would do with myself if I did let it happen to her."

¶20.    M.B.'s mother, Amy, testified that she and Kirkland were "close friends" and that she "trusted him more than any person on earth" before she knew about the abuse, but she did not spend "one on one" time with Kirkland much at all.  She said Kirkland often picked up M.B. and M.R., and M.B. stayed with them "quite often."  M.B. never came to her and complained about having to go to Kirkland's home; everything seemed fine to Amy.  She confirmed M.B.'s testimony that Kirkland took her to Slidell, out for dinner and for ice cream, and to other events.

¶21.    Amy testified that on the night M.B. and Andersen told her about Kirkland abusing M.B., M.B.  was "distraught," crying, and "couldn't talk."  The next day, they went to the police station where M.B. was interviewed, and the next week M.B. was interviewed at the Child Advocacy Center.

¶22.    Vicki Revell-Smith, a therapist and counselor at the Child Advocacy Center, testified as an expert in trauma therapy.  Revell-Smith testified that M.B. told her that she had been sexually abused by a family friend over a seven-year period.  Revell-Smith testified that M.B. was "struggling" with her "trauma" and was self-harming, depressed, and having suicidal ideations.

¶23.    Andersen testified that on December 10, 2019, M.B. asked to talk with her privately. M.B. called Andersen after cheer practice, which she had never done before.  M.B. seemed very anxious. M.B. told her about the abuse, and they talked for "a couple hours."  Andersen said that during their conversation, M.B. "started out a little anxious. Then as the

conversation progressed, it was, . . . sadness, a little bit of anger, and then she got to where she was . . . a little scared of what . . . the repercussions would be and how different aspects would be considered." The next day, Andersen contacted law enforcement to set up a meeting with them. She also went to M.B.'s parents and talked with them with M.B.

**B.  K.M.**

¶24.  K.M. was born in 2004 and was seventeen at the time of trial. She identified Kirkland in the courtroom as her abuser. She said that Kirkland touched her vagina and butt with his hand. Most of the time he touched her on top of her underwear, but he touched her when she was "bare a couple of times." Kirkland's hand would move "back and forth" when he would touch her vagina, but it was always on top of her clothes. He touched her bare butt with his hand, but his hand did not move. She said this abuse started when she was nine and in the third grade. It continued until she was in the sixth grade. At that point, K.M. said that she "put a stop to it" when she "quit going over to [his] house." She did not tell anyone what was happening because she did not want to hurt M.R.

¶25.  K.M. said she and M.R. were "good friends," and at one point were "best friends." She spent a lot of time at M.R.'s house. K.M. said that Kirkland would take her and M.R. to do fun things, like going to a splash pad for the day, going shopping, getting coffee, or getting their nails done. Sometimes M.B. would be with them. Kirkland would often pick up K.M. from school to take her and M.R. on these outings, and he would pay for everything.

¶26.  Regarding where the abuse took place, K.M. said that it always took place in the

10

upstairs room at Kirkland's home. She said that sometimes M.R. would be there, but she would go to bed a lot earlier, leaving K.M. alone with Kirkland. K.M. also said that M.R. sleepwalked and would sometimes leave the room in the night without K.M. realizing it. Kirkland would come in while she was lying down on the pull-out couch and watching television, sometimes with M.R. sleeping on the other side. Kirkland would come in and lie behind her and touch her. She would pretend to be asleep. It happened at least once a weekend when she was there, and she was there almost every weekend.

¶27. K.M. told M.R. about the abuse a year or so after it started. K.M. said, "I just told her about it, and she said that he would never do that, that it didn't happen. I was just like, 'okay' [and] I never said anything about it again." At that time, K.M. kept going to Kirkland's house because that was M.R.'s house too, and M.R. was her best friend.

¶28. K.M. also told M.B., who said it was happening to her too, but they agreed not to tell anyone. They did not discuss it in detail, but "it . . . was understood . . . that we were both uncomfortable and it was not a good situation."

¶29. K.M. said that when she stopped going over to Kirkland's house in sixth grade, her mother did not understand why she wanted to stop hanging out with M.R. Her mother thought she was "rude," so she went over there a few times after that. Kirkland did not touch her on those occasions.

¶30. Before K.M. could tell her mother what was happening, investigators came to their house while K.M. was at school and told her mother about the abuse. When K.M. got home,

11

her mother took her to a nearby park and asked her if what the investigators said was true. K.M. confirmed it was, and they both cried. M.B. told investigators K.M.'s name. K.M. said that M.B. had asked her the night before if she could "say her name" to the investigators, and K.M. told her that she did not think she was ready. But when she said that to M.B., M.B. said, "'Oh, it's too late.' And she had already told them." K.M. said on re-direct examination that she never told anyone because she was afraid of what would happen to M.R. and to M.R.'s family.

¶31. K.M.'s mother Heather testified. She said she had gone to school with M.R.'s mother. They were not friends but became reacquainted when they joined a social group together and realized that M.R. and K.M. were the same age. She said that K.M. went to Kirkland's house frequently and that when K.M. stopped going over there, she assumed that K.M. and M.R. "had drifted apart."

¶32. She learned about the abuse when investigators came to her home to ask about it. She told them she could not say either way whether the abuse was true, and that she would have to ask K.M. about it when she got home from school. When K.M. got home, they went to a nearby park, and she asked K.M. The next day, they went to the police and filed a report. Heather testified that it remains difficult for K.M. to talk about the abuse.

### C. S.F.

¶33. S.F. was born in January 2003 and was nineteen years old at the time of trial. M.R. was an "old friend" of hers. They met when S.F. was in fifth grade and M.R. was in fourth

grade; they became "close friends." S.F. said that Kirkland would pick them both up from school, and she and M.R. would hang out at Kirkland's house. She said that Kirkland "was really kind" and would take them shopping or to get ice cream, and sometimes they would go to baseball games. Kirkland would pay for everything.

¶34. When she was at Kirkland's house, she and M.R. would watch television upstairs but usually slept in M.R.'s room, which was downstairs. The few times she slept upstairs on the pull-out couch, M.R. was with her. M.B. sometimes came over too and spent the night, but on those nights, M.B. usually slept alone upstairs. Kirkland told M.B. to sleep upstairs those nights.

¶35. S.F. testified that one time, when she was in seventh or eighth grade, she and M.R. were sleeping on the pull-out couch. S.F. woke up and tried to roll over but could not. She felt someone's hand on her upper thigh. It was Kirkland. S.F. used her phone to call M.B., and when Kirkland realized that S.F. was awake, he got up and left. It never happened again, and she never brought it up to Kirkland. She did not tell her mother at that time because she was scared.

¶36. S.F. stopped hanging out with M.R. as much but felt "really bad about it" because M.R. was such a good friend to her. But she was afraid to spend the night at Kirkland's house. Not too long after the incident with Kirkland, she and M.B. tried to tell M.R. about the abuse. According to S.F., M.R. "didn't seem surprised about it." S.F. knew K.M. through M.R. and M.B., but never spent the night at Kirkland house when K.M. was there.

13

The last time S.F. spoke to K.M. was when the abuse "came out." S.F., K.M., and M.B. texted about the abuse being made public. S.F. told her mother about what happened and that she "was ready to go to the police about it." She was interviewed by the police and others.

## II. The Defense's Case

¶37. After the State rested, the defense unsuccessfully moved for a directed verdict. M.R. was the first witness to testify for the defense.

¶38. M.R. said that she and M.B. usually slept upstairs on the pull-out couch, but one night M.B. asked M.R. to go downstairs, so M.B. could sleep alone. M.R. and her mother thought that M.B. might have some personal problems, so M.R.'s mother checked on her "multiple times" that evening. M.R. testified that sometimes Kirkland would move M.B. from the couch to his bedroom so he could use his office, where the pull-out couch was located. Whenever K.M. or S.F. stayed the night, they slept upstairs, and M.R. was with them. M.R. never saw anything inappropriate. She said that Kirkland treated all her friends the same way he treated her.

¶39. M.R. testified that M.B. would often ask Kirkland to give her shoulder massages after cheer practice. Sometimes he would refuse, and sometimes he would give them to her. M.R. would be there too. She said that the shoulder massages lasted about a minute. M.R. said that M.B. wanted to be the center of attention.

¶40. When asked about K.M., M.R. said that she was "very flirtatious" and would hug men and sit in their laps. K.M. once asked Kirkland to massage her legs after hurting them in

14

cheer, and he massaged them.

¶41.    During cross-examination, M.R. admitted that she was a hard sleeper. She also admitted that she was not always with M.B. upstairs and that she often was asleep when K.M. or S.F. stayed over. M.R. testified that sometimes Kirkland would stay in the room with her and her friends until they fell asleep and that she did not know when he left. She remembered M.B. telling her that she had seen Kirkland "touching his private area," but M.R. did not remember when it happened. M.R. told her mother about it to let the adults take care of that situation.

¶42.    G.R. (M.R.'s older sister) testified that she had not seen anything inappropriate take place between Kirkland and any of M.R.'s friends. G.R. was twenty-one at the time of trial. She is five years older than M.R. and did not spend too much time with M.R. and her friends. She had her own friends over to the house and never saw anything inappropriate between Kirkland and her friends, and no one ever told her anything inappropriate had happened. Kirkland's son-in-law also testified and said he had not seen anything inappropriate take place between Kirkland and M.R.'s friends. Additionally, a friend of G.R.'s testified that she had spent the night at Kirkland's home when M.B., K.M., and S.F. were also there. She did not see anything inappropriate happen.

¶43.    Kirkland testified in his own defense and denied ever inappropriately touching the three girls. He said that when M.B. started coming over, she stayed in M.R.'s room, and the two girls played and hung out all over the house. At some point, M.B. started sleeping

15

upstairs, alone. He asked M.R. about it, and she told him that M.B. wanted to sleep alone. He told M.R. that "it was up to them."

¶44. Kirkland testified that one morning he woke up to find M.B. in his bed with him. He was "quite upset" about it. He immediately got out of the bed and went to find M.R., who was still asleep and did not know M.B. had gone up there. He talked to M.B.'s mother about it, and M.B. did not come into his bed anymore after that. It did not bother him that the girls would sleep on the pull-out couch because he had his own bedroom.

¶45. Regarding K.M., Kirkland said that she spent the night with M.R. on a regular basis. He said they slept all over the house, including the pull-out couch that was upstairs. He said that one night, K.M. said she had seen a cockroach in M.R.'s room and asked if they could sleep upstairs. Kirkland said yes. After a while, they asked Kirkland to come lie down with them because K.M. was still scared. He did so, but once the girls were asleep, he left and went back to his room. He said that the girls came and got into his bed a few times, but he got up and slept on the pull-out couch when that happened.

¶46. Kirkland said that M.B. asked him for shoulder and leg massages following cheer practice, and he would give them to her. He denied ever taking those massages to any "inappropriate areas." When asked about the masturbation incident, he said that he talked with M.B. about it. He told her that he had been informed that she saw him touching himself, and he apologized to her. He did not know that M.B. was there.

¶47. Regarding S.F., Kirkland said that she also sometimes slept upstairs on the couch.

16

The last time she was there, she asked Kirkland to massage her thigh. He did so and said that was the only time it happened. He denied S.F.'s testimony that she woke up with his hands on her thighs.

¶48. Kirkland said that he had "no idea" why the three girls would lie about his actions.

¶49. Several witnesses, including Kirkland's ex-wife, testified that Kirkland had a "good reputation" in the community for truthfulness and veracity.

¶50. The defense rested. After informing the trial court that it had no rebuttal witnesses, the State also rested. The defense unsuccessfully renewed its motion for a directed verdict, adopting the same arguments made in its original motion.

### III. The Jury Verdicts, Sentencing, and Kirkland's Post-trial Motions

¶51. Following trial, the jury unanimously found Kirkland guilty as charged in all nine counts against him. The trial court sentenced Kirkland to serve a total of thirty-five years in custody. Kirkland's post-trial motion for judgment notwithstanding the verdicts or a new trial was denied. Kirkland appeals.

### DISCUSSION

### I. Severance of Multi-Count Indictment

¶52. Kirkland asserts that the trial court erred when it denied his request that the trial court hold three separate trials as to the three alleged victims. We find no reversible error for the reasons addressed below.

¶53. The appellate courts "review[] a trial court's denial of a motion to sever multiple

17

counts of an indictment for abuse of discretion." *Graves v. State*, 216 So. 3d 1152, 1163 (¶32) (Miss. 2016).

¶54. With respect to "trials concerning multi-count indictments, severance is unnecessary in Mississippi if the acts or transactions are connected together as part of a common scheme or plan and if the indictment was otherwise proper." *Rushing v. State*, 911 So. 2d 526, 532 (¶13) (Miss. 2005) (citing Miss. Code Ann. § 99-7-2 (Rev. 2000)). Specifically, section 99-7-2 provides:

> (1) Two (2) or more offenses which are triable in the same court may be charged in the same indictment with a separate count for each offense if: (a) the offenses are based on the same act or transaction; or (b) the offenses are based on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan.
>
> (2) Where two (2) or more offenses are properly charged in separate counts of a single indictment, all such charges may be tried in a single proceeding.

¶55. Similarly, the joinder of offenses in an indictment is allowed "if the offenses . . . are (1) based on the same act or transaction; or (2) connected with or constitute parts of a common scheme or plan." MRCrP 14.2(a)(1)-(2). Pursuant to Rule 14.3(a)(2), "[t]he court may, on motion of the state or a defendant, grant a severance of . . . offenses if it is deemed appropriate to promote the fair determination of a defendant's guilt or innocence of each offense."

¶56. In *Corley v. State*, 584 So. 2d 769 (Miss. 1991), the Mississippi Supreme Court outlined the recommended procedure a trial court should follow in deciding a motion for severance, as follows:

18

> We recommend that a trial court hold a hearing on the issue. The State, then, has the burden of making a prima facie case showing that the offenses charged fall within the language of the statute allowing multi-count indictments. If the State meets its burden, a defendant may rebut by showing that the offenses were separate and distinct acts or transactions.

*Richardson v. State*, 74 So. 3d 317, 324 (¶22) (Miss. 2011) (quoting *Corley*, 584 So. 2d at 772).

¶57.    The trial court should consider three factors first delineated in *Corley* in determining whether a multi-count indictment is proper:  "(1) the time period between offenses, (2) whether the evidence proving each count would be admissible to prove each of the other counts, and (3) whether the crimes are interwoven." *Id.*

¶58.    Regarding the first *Corley* factor, we recognize that Kirkland's offenses span a time period from August 2013 to July 2018.  But the offenses overlap among the three girls,[6] and the time span serves to underscore the common scheme of abuse that Kirkland undertook: Kirkland used his young granddaughter's friendships with other young girls to target and prey on his victims.  As M.R. made new friends, Kirkland gained new victims and followed the same grooming pattern each time.  Viewing this factor (time period) in light of the "totality of events," as we must, we find that the time span in this case was insignificant and did not require severance.  *Rushing*, 911 So. 2d at 536 (¶17) (recognizing that the *Corley*

---

[6] As noted above, Counts I through V concerning M.B. described offenses occurring on or between August 1, 2013, and July 31, 2018; Counts VI through VIII concerning K.M. described offenses on or between August 1, 2014, and July 31, 2017; and Count IX concerning S.F. described an offense occurring on or between August 1, 2016, and July 31, 2017.

factors, and specifically the time factor, must be "read[] together with regard to the totality of the events" in determining whether severance was required).

¶59. With respect to the second *Corley* factor, Kirkland asserts that "the evidence in the other counts would not be admissible to prove Kirkland's guilt in any of the other counts."[7] In *Richardson*, however, the supreme court found that the trial court did not abuse its discretion in refusing to sever an indictment "despite evidence being needed to prove each count that would not be admissible to prove the other count." *Richardson*, 74 So. 3d at 326 (¶31). Continuing, the supreme court observed that although "the trial court recognized that there would be different witnesses and different evidence for the two crimes" charged in the indictment, the testimonies of other witnesses concerned both charges, and the trial court "instruct[ed] the jury that the two counts were separate offenses and should be considered separately." *Id.* at 326-27 (¶¶31, 33). Under these circumstances, the supreme court found that the trial court did not abuse its discretion by finding that both counts should be tried together. *Id.* at 326 (¶31).

¶60. Similar circumstances exist here. Accordingly, we find no abuse of discretion on the trial court's part in denying severance based on the second *Corley* factor. As the State

---

[7] Kirkland cites *Derouen v. State*, 994 So. 2d 748 (Miss. 2008), in support of this assertion, but *Derouen* concerns whether evidence of sexual abuse may be admissible in other cases under Mississippi Rule of Evidence 404(b). *Id.* at 756 (¶20). Regarding the propriety of a multi-count indictment, however, the supreme court has specifically recognized that "[w]hether . . . evidence would be admissible under [Rule 404(b)] has no bearing on whether the trial court should allow a multi-count indictment." *Corley*, 584 So. 2d at 772 n.1. Thus, we do not find Kirkland's reliance on *Derouen* germane to this issue.

pointed out at the severance hearing, all three girls would (and did) testify that Kirkland took them out to eat and took them on other fun outings, and they would often spend the night with M.R., frequently sleeping on the upstairs pull-out couch. The girls also testified that they were aware that something inappropriate was happening to the other girls, and they texted about the timing of M.B.'s eventual disclosure. As such, although all the evidence for each count could not be used to prove the other counts, much of the victims' testimonies and evidence offered by the State was admissible to prove the other counts. And as in *Richardson*, the trial court instructed the jury that each count should be considered separately.

¶61. The third *Corley* factor requires the trial court to consider whether the crimes were interwoven. Addressing this factor, the supreme court in *Rushing* found interwovenness when the crimes "involve too many similar factors when viewed together[] to be anything but clearly linked and part of the same common scheme or plan." *Rushing*, 911 So. 2d at 536 (¶19); *accord Harris v. State*, 908 So. 2d 868, 875 (¶25) (Miss. Ct. App. 2005) (observing that where there is a "common thread running through each of the counts," there may be sufficient interwovenness).

¶62. Kirkland asserts that the interwovenness factor is not met here because the crimes did not occur on the same night and that the victims were not present during the crimes committed against the others. This Court rejected a very similar argument in *Harper v. State*, 102 So. 3d 1154 (Miss. Ct. App. 2012). We likewise do so here.

¶63. In *Harper*, the defendant argued that the alleged sexual abuse crimes against two victims were not interwoven "because the two victims were never together when the abuse occurred." *Id.* at 1158 (¶12). The Court found this argument without merit where "the witnesses' testimony overlapped[,] . . . the sexual acts were similar in nature, occurred during the same time period, and occurred at the same location." *Id.* The Court also noted that the trial court had instructed the jury that it must "return a separate verdict for each count of the indictment." *Id.* at 1159 (¶14).

¶64. As in *Harper*, there is a common thread in Kirkland's crimes. That is, Kirkland used M.R. to find new victims and got close to them by giving M.R. and her friends gifts and taking them on fun outings. Further, the sexual acts were similar in nature and typically occurred upstairs when the girls spent the night. And, as noted above, the jury was instructed to return a separate verdict on each count. We find that the interwovenness *Corley* factor is met here.

¶65. Kirkland also generally asserts that the counts should have been severed as to each victim because "the defense was put in a position to defend against three accusers, and this alone, practically destroyed any presumption of innocence the defendant should have had in standing trial." The supreme court, however, has specifically held:

> Whenever a defendant is tried on a multi-count indictment, the possibility that a jury will infer guilt on all counts from guilt on one individual count does not warrant reversal so long as the jury is instructed that each count must be considered separately, and each count is supported by substantial evidence and proven beyond a reasonable doubt.

22

*Armstead v. State*, 978 So. 2d 642, 649 (¶31) (Miss. 2008). In the case before us, the jury was instructed that each count should be separately considered. Further, each count was supported by substantial evidence and proved beyond a reasonable doubt—which Kirkland does not challenge. Accordingly, we find that this alternative argument is without merit.

¶66. In sum, the trial court heard the State's case for trying the counts together in which it addressed each of the *Corley* factors and heard Kirkland's arguments for severance. The trial court considered applicable caselaw, the *Corley* factors, and the arguments made by each side. After doing so, the trial court found that Kirkland's actions were part of a common scheme or plan and that he engaged in similar behaviors with each of the three girls. We find that the trial court's findings are supported by the record. The trial court also instructed the jury it must consider each count separately. Accordingly, we find that the trial court did not abuse its discretion in denying Kirkland's motion to sever.

## II. Discovery Violation

¶67. Kirkland asserts that the trial court erred by finding no discovery violation when the State did not tell the defense that M.B. had her disclosure date tattooed on her left wrist. Kirkland moved for a mistrial based on the "highly prejudicial" nature of the tattoo. The trial court denied Kirkland's motion and alternative request for a cautionary instruction. "The decision to admit or exclude evidence is left to the trial court's discretion." *Mouton v. State*, 227 So. 3d 1079, 1083 (¶15) (Miss. 2017). "This abuse-of-discretion standard also extends to alleged violations of" what is now Mississippi Rule of Criminal Procedure 17 "and to a

23

trial court's denial of motions for continuance or mistrial." *Id.* For the reasons addressed below, we find the trial court did not abuse its discretion in finding no discovery violation and denying Kirkland's motion for a mistrial and request for a cautionary instruction.

¶68. We begin our analysis by reviewing what occurred at trial on this issue. As noted, M.B. told Andersen about the abuse on December 10, 2019. M.B. had that date tattooed on her wrist. This fact was conveyed to the jury at trial when the State questioned M.B., as follows:

> Q: [M.B.], tell me, what day was it that you told [Andersen] what had been going on all these years?
>
> A: It was December 10, 2019.
>
> Q. How do you remember that day?
>
> A. It's burned into my memory forever and also my wrist.
>
> Q. What do you mean?
>
> A. I have a tattoo of the day I told her on my wrist.
>
> Q. Can you show me?
>
> A. (Indicating.)
>
> Q. So this is tattooed on your left wrist?
>
> A. Yes.

¶69. The defense objected and the trial court heard the parties' arguments outside the presence of the jury. Kirkland's counsel objected to "the demonstrative evidence of showing the wrist," arguing that the tattoo was not included in discovery and that the State had

24

committed a discovery violation. The State admitted it was "recent[ly]" made aware of the tattoo. The State acknowledged that it did not know why the tattoo was not disclosed to the defense but noted that the State did not believe that "it changed the facts of the crime or the disclosure that [M.B.] made." Kirkland's counsel asked the court for a mistrial because the tattoo was "highly prejudicial" and also asked the trial court to give a cautionary instruction. The trial judge said that he would address the issue the next day and gave "the defendant an opportunity to research it and provide a case" to support his motion for a mistrial. The testimony continued.

¶70. At the end of M.B.'s testimony, the trial court held another hearing on Kirkland's motion for a mistrial related to M.B.'s tattoo. Although defense counsel was unable to find any authority requiring a mistrial, he reiterated that it was a discovery violation that had a "prejudicial effect" on the jury, so a mistrial was warranted. He also asked for a cautionary instruction but provided no authority to support one. The State argued that the tattoo was not covered in discovery because the defense was already on notice of M.B.'s disclosure date. Further, for there to be a violation, there must be prejudice to the defendant and the information must be more than simply cumulative. The State argued that there was no prejudice and that the tattoo was cumulative evidence.

¶71. The trial court denied both the motion for a mistrial and request for a cautionary instruction. In so doing, the trial court observed that "[a]ll [M.B.] did was said she had a tattoo. She raised her arm up. All I could see was that it's a date, and it's the same date that

25

she already testified to that she first told someone of the incident. . . . I fail to see the prejudice in it." The trial court found that "this was not a discovery violation," nor did the circumstances "rise[] to the level of a mistrial" or require a cautionary instruction.

¶72. On appeal, Kirkland asserts that the State's failure to disclose M.B.'s tattoo was a discovery violation, but he does not address how it can be categorized as a required disclosure under Rule 17.2. In relevant part, Rule 17.2 provides:

> [T]he prosecution must disclose to each defendant or to the defendant's attorney, and permit the defendant or defendant's attorney to inspect, copy, test, and photograph upon written request and without the necessity of court order, the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution:
>
> (1) Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement (written, recorded or otherwise preserved) of each such witness and the substance of any oral statement made by any such witness;
>
> . . . .
>
> (5) Any physical evidence, photographs, and data or information that exists in electronic or magnetic form relevant to the case or which may be offered in evidence; and
>
> (6) Any exculpatory material concerning the defendant.

MRCrP 17.2.

¶73. To be sure, the date of M.B.'s disclosure was a part of her statement and testimony. But Kirkland already knew she would testify to that from the State's disclosures. Kirkland did not know that this date was tattooed on M.B.'s wrist, but he offers no argument or

26

caselaw explaining how the tattoo, itself, was within the scope of Rule 17.2. Indeed, at trial, defense counsel referred to the tattoo as "demonstrative evidence." In this regard, the supreme court has recognized that "the plain language of Rule 17.2 does not address nor require the production of demonstratives prior to trial." *Turner v. State*, 319 So. 3d 1066, 1082 (¶48) (Miss. 2021). "[B]ecause the types of demonstrative evidence and the purposes for which it is sought to be introduced are extremely varied, it is generally viewed as appropriate to accord the trial judge broad discretion in ruling upon the admissibility of many types of demonstrative evidence." *Tillis v. State*, 176 So. 3d 37, 59-60 (¶82) (Miss. Ct. App. 2014). "Unless that discretion is so abused as to be prejudicial to the accused, this Court will not disturb the trial court's ruling on appeal." *Id.* at 60 (¶82).

¶74. In this case, Kirkland asserts that the tattoo itself "created an emotional impact in the eyes of the jury," and by not disclosing its existence, "the State foreclosed any ability for Kirkland to attempt to mitigate the evidence." But as the trial court observed, and as reflected in the trial transcript quoted above, all M.B. did was say that "she had a tattoo. She raised her arm up. All [the judge] could see was that it's a date, and it's the same date that she already testified to that she first told someone of the incident. . . . [The judge] fail[ed] to see the prejudice . . . ." The trial judge also noted that when the State asked M.B. what she had on her wrist, and M.B. showed the tattoo, "[the judge] was watching [and] . . . didn't see any reaction from the jury at all. They really had no reaction. [The judge] had no reaction."

¶75. In addressing this assignment of error, we are cognizant of the trial judge's ability "to

27

observe the body language, demeanor, inflections and other visual and auditory keys which help the trial court make its decisions" and the deference we therefore give "to a trial court's ruling[s] . . [that] arise in the course of a trial." *Flowers v. State*, 947 So. 2d 910, 939-40 (¶76) (Miss. 2007) (Cobb, P.J., concurring). With this deference in mind, we find that the trial court did not abuse its discretion when it found that there was no discovery violation. The State had already disclosed in discovery the date of M.B.'s disclosure, that she would testify to it and the circumstances surrounding her disclosure, and that Andersen, M.B.'s cheer coach, would also testify to the date and those circumstances. The tattoo itself was cumulative as to what the State had already disclosed.

¶76. Kirkland also asserts that the "procedural timing" for the trial court's discovery violation analysis was in error because the court should have decided the issue before allowing M.B.'s testimony to continue. Citing *Brown v. State*, 306 So. 3d 719, 741 (¶80) (Miss. 2020), Kirkland further asserts that after objecting to the tattoo, he should have been allowed "a reasonable opportunity to familiarize himself with the evidence" pursuant to *Box v. State*, 437 So. 2d 19 (Miss. 1983), and Mississippi Rule of Criminal Procedure 17.9(b).[8]

---

[8] Rule 17.9 provides, in relevant part:

(b) Failure to Make Disclosure—Trial. If, during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these Rules and the defense objects to the introduction for that reason, the court shall:

(1) Grant the defense a reasonable opportunity to interview the newly discovered witness and/or examine the newly produced

28

We are puzzled by Kirkland's argument because after objecting, defense counsel seemingly ignored Rule 17.9(b)(1) that provides for allowing the defense an opportunity to examine the "other evidence." He did not seek a continuance but rather proceeded to Rule 17.9(b)(2) by immediately presenting his arguments about the prejudicial effect of the tattoo. He then moved for a mistrial and, alternatively, requested a cautionary instruction. *See* MRCrP 17.9(b)(2). The trial court gave defense counsel until the next morning to research the issue "and provide a case" to support his motion for a mistrial. We find no abuse of discretion in the trial court's handling the issue in this way under these circumstances.

¶77. Nor do we find an abuse of discretion in the trial court's ruling denying Kirkland's motion for a mistrial or request for a cautionary instruction. *Mouton*, 227 So. 3d at 1083 (¶15); *Thomas v. State*, 195 So. 3d 843, 849 (¶15) (Miss. Ct. App. 2016). Regarding a mistrial, the supreme court has explained that "[a] trial judge need declare a mistrial only when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case." *Sharkey v. State*, 265 So. 3d 151, 155 (¶14) (Miss. 2019). We find

---

documents, photographs or other evidence.

(2) If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence, grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence, or grant a mistrial.

MRCrP 17.9(b)(1)-(2).

no such prejudice here.

¶78. Kirkland asserts that "M.B.'s tattoo bolstered the State's case by strengthening M.B.'s testimony," but Kirkland does not show how this constituted "substantial and irreparable prejudice" to his case when he already knew that at least two witnesses would testify about the date of her disclosure and the circumstances surrounding it, and he was provided with all of M.B.'s counseling records evidencing her emotional state, including depression, cutting herself, and an attempted suicide. M.B. testified at length about her emotional state at trial. In any event, to the extent the tattoo "strengthened" any part of M.B.'s case, it was simply that she told Andersen about the abuse on December 10, 2019, not whether what she told Andersen was true. For the same reasons, we likewise find no abuse of discretion in the trial court's refusing to give a cautionary instruction about the tattoo. *Jarvis v. State*, 281 So. 3d 133, 136 (¶10) (Miss. Ct. App. 2019) ("[R]eversal is appropriate only when a trial court commits an abuse of discretion resulting in prejudice to the accused.").

¶79. Based on the foregoing analysis, we find no abuse of discretion in the trial court's ruling that there was no discovery violation and that neither a mistrial nor a cautionary instruction were warranted.

¶80. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND EMFINGER, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. SMITH, J., NOT PARTICIPATING.**